It's 416-0623. People v. Glantz. And for the appellant, it's Mr. St-Germain. Is that pronounced correctly, sir? Yeah. You can anglify it if you want. Well, tell me how you pronounce it, and I'll do my best. I pronounce it St-Germain. St-Germain? I would prefer St-Germain. Well, if you call it the name St-Germain, I will too. Okay. And for the appellee, Ms. Baragas? Burgess. Burgess. I apologize. This is not your first time here, and I, with my limited memory... But it isn't spelled on our note, so that excuses you. At least it is on mine. B-U-R-A-G-A-S? No, it's spelled correctly. Oh, it is? Yeah. And pronounced Burgess? Correct. Oh. This has been an interesting interview. Yes! Oh, yes. Okay. Well, without further ado then, Mr. St-Germain, you may proceed, sir. Good afternoon, Your Honor. Good afternoon. And may it please the Court, Counsel, my name is Santo St-Germain, and I am here on behalf of Mitchell Glantz. Your Honor, because the issue in this case is very fact-intensive, I'm going to briefly give the Court a synopsis of the facts, just to reacclimate ourselves to the situation and circumstances of the case. Deputy Campbell effectuated a traffic stop on Mr. Glantz. The stop was concluded when Deputy Campbell issued a warning, and then told him that that's all he had for the stop. Following that statement, Deputy Campbell asked Mr. Glantz whether he would answer additional questions. Mr. Glantz said yes. That initiated a consensual encounter. During the consensual encounter, there was a brief questioning regarding the possibility of drug possession and the possibility of a hypothetical dog sniff. That, following that conversation, Deputy Campbell asked Mr. Glantz if he would consent to a call search. Mr. Glantz said no. And once Mr. Glantz said no, Deputy Campbell immediately radioed in for a canine. In requesting a canine, Deputy Campbell altered the nature of the consensual encounter and effectively seized Mr. Glantz without reasonable suspicion. There are two reasons which support that conclusion. First, a consensual encounter is limited to three purposes. The first purpose is to ask additional questions, which Deputy Campbell did. The second purpose is to request identification, which Deputy Campbell did not need to do because he already had Mr. Glantz's identification, which he returned to Mr. Glantz once he issued the warning for the traffic stop. And the third purpose, which is the highest threshold for a consensual encounter, is to obtain consent for a search or a pat-down. Deputy Campbell played his trump card. He asked for consent to search the call, and consent was denied. Once consent was denied, the consensual encounter should have terminated and, in fact, didn't terminate it because the limited purposes have all been achieved. However, Deputy Campbell decided to immediately request for a canine. Isn't it true that it's not quite, he was asked for consent and it was denied. He was asked for consent and it was denied, and then the defendant continued to speak about how he thought he was being hassled and other problems and his experiences from the day before and all that? Respectfully, Justice Steinman, that is incorrect. What happened in this case, and I would point the court to about 12 minutes and 45 seconds, up to 14 minutes and one second of the recording, which I would urge all members of this court to look because it captured exactly what happened in this case. At about 12 minutes and 45 seconds, Deputy Campbell started asking for consent. There was a back and forth, and then Deputy Campbell said, well, I don't want to open up. There's ways I can and there's ways that I do stuff. That is why I'm asking for your consent, for me. And then Mr. Grants immediately said, no, I'm not giving you my consent. And once Mr. Grants said that, Deputy Campbell leaned over, pulled up his microphone and said, 31 K-19. There was no interlude between them. Well, I didn't say there was an interlude, and they want to leave out the business that you just mentioned about the officer Campbell on the microphone, on the calling ear. The defendant continued to speak and continued to explain about why he was declining and why he was upset from proceedings that had been before. In other words, this is not quite a situation, if I understand correctly, correct me if I'm wrong, where Campbell says, I'd like your consent to search. He says, no. He says nothing. That's not what happened, is it? He said no, and then he was providing an explanation as to why he was saying no, but I don't think that alters that. In fact, I retract my statement. That does not alter the ultimate court amendment issue in this case. Well, but the reason I mention that is, as he continues to talk, doesn't this keep the from where the defendant, on the one hand, says, no, I don't want a consent, and says nothing else. On the other, says, no, I don't want a consent, and continues to talk about it, and here's what happened yesterday, and tried to make the hassle, blah, blah, blah, because then, when he does that, further conversation of the subject, it seems to me, would be appropriate. Maybe, justifiably, but the what happened next is also critical, because when Deputy Campbell's radioed in for the canine, my client noticed that, he immediately sees What is it in the record that suggests your client noticed it? Because of what he said next, and what he said next, once he realized that the canine was requesting, he said, do what you have to do, but I'm not giving you consent. So, and he terminated it. He ceased talking, and there was a brief moment of silence. That right there shows one thing. Well, it shows two things. One is clearly and unequivocally denying his consent to search his car, and second is that he realized, as he said, do what you have to do, but I'm not giving you my consent. He realized that, at that moment, he had no other option. The dog has been requested, and all he could do is deny his consent. Well, it seems, here's a problem I have with this case, and I want you to address it. It seems to me that a big part of your case is the call that the defendant, or Campbell, made about calling, as this record says, 31 inaudible canine police. Yes. They told witnesses who testified at the hearing of the motions to suppress Campbell and the defendant. It seems to me that this is an important point, that is, assuming it was said, assuming the defendant changed his understanding of the dynamics of what was going on, I think that would be an arguably strong point for the defendant on why things thereafter couldn't have been consensual, that his consent doesn't count thereafter because of the actions taken by the officer. Let's assume for the moment that it never happened. That would be a weaker case, wouldn't it? So your question is... Campbell never made the call. Campbell never made the call, then yes, it is a weaker case. So here's my point, but just to witnesses who testified. The significance of all of this, since it was the whole issue on the motion to suppress, really should have been apparent from the get-go, and I'm troubled that the defendant was never asked explicitly, what did you hear? What did Campbell say? How did that affect you, or where does that affect? Instead, you're left to argue to us that the manifest weight of the evidence or whatever, in context, we should infer that the defendant heard this and how it affected him. That's kind of troubling. Why wasn't the defendant asked and given the opportunity to explain what he heard and how it affected him and what he thought about this and how it, in effect, the argument is, vitiated any subsequent consent? Well, Your Honor, I would disagree that he was not asked. So he was not specifically asked whether he heard the dog being called, but to suggest otherwise that he didn't hear it, it's manifestly not true. How is this remaining an issue? There are just two witnesses. This is the key thing. We're talking about, what, 15 minutes worth of testimony? And he's never asked, did you hear that call? Did you hear the dog being called? Your Honor, that would have been a fair question to ask, but I don't think it was a necessary question to ask. If you look at the video, you will see they are in close front cabin of the squad car. He's sitting right next to Deputy Campbell. Deputy Campbell leaned over towards his direction because that's where the microphone was. Pulled the microphone, made the call. How do we know Campbell leaned in his direction? Once you look at the video, the microphone was on his right shoulder. My client, Mr. Gantz, was sitting on the right, the front passenger side. Deputy Campbell leans over. You can see it in the video. He pulls up the microphone and he says, 31 K-9, please. You don't need much questioning to be done in order to understand that a person sitting this close, in close vicinity with a police officer, leaning towards his position, would not care or understand that. The fact that the record says 31 inaudible is an indication that maybe some of this is from the record and say that the transcript that is provided in the brief, that's my rendition of the transcript. I put in inaudible because I couldn't hear what was said between 31 and K-9, please. I think you couldn't hear what was said because your client was still talking. No, there was cars driving by. This was in the dead of winter in January. It was the record. You can hear the sound of the wind. The transcript in there is a transcript created by Appellate Counsel, myself, in order to provide context and a proper record for the court. This is not a transcript that was done by a professional transcriber. Let me tell you, I took it as if, and I've read it and listened to the audio, and it was to me, and I'm not the char of fact, but to me it was as if I'm the unluckiest man in the world and he's venting. I think it's highly probable, possible, or both, that he did not listen with careful ear to what the officer said because he didn't care. It was like, my God, what else is going to happen to me? I get stopped. I get harassed. Somebody puts a hold on my checking account. I'm just trying to travel across the country, and the check account, okay, I'm not getting any farther, so I'm going to call for the drug, for the canine. Sure, but respectfully, Justice Kennedy, there are two things that he said after that. There's two things that shows that he had no choice. Right, okay. It's one thing after another, man. That's part of the soliloquy about I'm the unluckiest man in the world. I know he doesn't say that, but that's the tenor of it. Do what you have to do. Do what you have to do. If I were the trial judge, I'd be interpreting it, or might be interpreting it as if, okay, you've already told me you've got other things you can do, so go ahead and do it. Not necessarily in response. That's what the problem about this not being brought up. If it's brought up, it can be clarified. If it's not brought up, it's really difficult to tell whether he's just continuing to vent because he's realized, not because of the call, but because of the situation. I'm the unluckiest man in the world. You're going to go ahead and do what you've got to do, and I'm just going to sit here, and he says, well, do you mind waiting for the dog? No? Okay, sure. I understand that having been brought up in questioning at the motion for suppression, at the hearing on the motion, then yes, that would have been a clear indication that he heard it. Nonetheless, it is within this court to look at the facts and see whether the facts in themselves support the notion that there was an alteration. You don't need to look at what was asked at the motion for suppression. You need to look at the video, and what is shown on the video is that Mr. Glantz resigned himself to the inevitability of an eminent canine. But there's no chance for anybody to argue that you didn't hear it, or you did hear it, or what could you hear, or did you know what he meant, or did the word canine leap out at you, and you knew, okay, I'm done for. That's why the issue needed to be brought up, and that's why it needed to be explored, so that we wouldn't be sitting here asking these questions, and you and I suggesting to one another how we might interpret the audio. He was asked at the hearing on the motion. What did he say? He was asked whether he felt at that time he was free to leave. No, he didn't think he was free to leave. Nobody thinks they're free to leave from the moment they're pulled over. It's a legal fiction that the reasonable person would think, okay, I'm free to leave. It doesn't alter the argument. If it is a legal fiction that he at no time... Well, we can't acknowledge that it's a legal fiction. I'm just suggesting. Legal fictions are important things. Well, Justice Kinnick, in your honors, I don't think that it is a fair argument that Mr. Glenn stated here that the dog was called. I do think that he heard the dog was called, and he resigned himself to that call because of what he said next. That is a fair argument. And not just fair argument, but what he said next. What he said next is, well, since we're going to be here, which is a clear indication that he is stuck. He has no option but to wait for that canine. Counselor, are you conceding that if your client did not hear the officer call for the canine on the record, whether he heard it, that you are going to lose today? Because I really am not positive why it makes that much difference whether your client heard the officer call for the canine. So that's why I asked the question. I don't... I agree with you, Justice Kinnick. I don't... I actually don't have... I'm not sure, so I'm hoping you can clarify for me. I do not believe it makes any other difference. Because when you're looking at a consensual encounter, what matters is the conveyance of a message, not the reception of that message. Once Deputy Campbell conveys the message, whether the message is received or not, once Deputy Campbell conveys that message, that you are no longer free to leave, then you are no longer in a consensual encounter. Okay, so your argument is not then, because I thought maybe it was, that once the officer made that call, it would be a reasonable inference, since the officer knows that the dog is coming, to make sure that the defendant and his car are still there when the canine arrives. That's not your argument. That is not my argument. Okay. My argument is, once the call is made, there better conveyance of a message that you are no longer free to go. So, in effect, you're arguing he was seized without reasonable suspicion when Deputy Campbell called the canine unit. Yes. Was that argument made specifically to the trial court? The argument was made in term of... The argument was made under Rodriguez. What was argued at the trial court... Thank you. Does that have a helpful response? Was the argument I just quoted to you, that you said yes, was that argument made to the trial court? I'll repeat it. That the defendant was seized without reasonable suspicion when Deputy Campbell requested a canine unit. Under no specific language, no, but the argument that was made at the trial level was that there was an unlawful extension once the canine was caught. That was the argument made. The language that you're quoting back to me is my language interpreting the trial argument. The trial argument was there was an extension in violation of Rodriguez v. United States. Well, at any point in the trial level, did the defendant argue that the request for a canine Campbell made amounted to a seizure? Yes. Yes, because what trial counsel argued is that there was an unlawful extension under Rodriguez, and that is a seizure. Under Rodriguez, if you extend the original purpose of a trial, or if you alter the... Well, I'm a sympathetic guy. I'm sympathetic in the sense of my sympathies are always with the poor trial judge who has to hear these things and resolve them. So, by that I mean what I'm asking is explicitly in saying, Judge, the motion to suppress we filed here should be granted because when Campbell called for a canine unit, that amounted to a seizure. Justice Steinman, I am gracious for your sympathy, but you're asking me whether the exact language was precise to the scene. No, it was not precise to the scene. Well, here's my concern. I want you to address it. One of my, the reason my sympathy with Lynch and Flash and Nia, it says, I'm never going to reverse the trial court based upon an argument the trial court never heard. Well, never is a strong term, but that's pretty much the position. Don't worry about time. I'm going to give you a chance to respond. The reason I asked about this precise language, the reason it's important is, it appears to me that you are asking us to reverse the trial court because you're arguing the request for a canine that Campbell may have brought into a seizure, but the trial court never heard those words and that precise argument, and I'm concerned that we're violating this fundamental rule if we accept your argument now. No, there is no, there's no violation of any fundamental rule of Justice Steinman and to the other members of this court. What is clear on the Fourth Amendment rule is that legal argument must be reviewed to know what is clear from the argument that was made at the trial court level is that he is arguing a United States, a Rodriguez versus United States violation. The language that I use is a refinement of the argument at trial. You see, I was a trial judge for a long time. That's why I have sympathy for trial judges, and if you get up there and say, Judge, this is an Illinois versus Rodriguez violation, I'm thinking, what the hell was that case about? Not helpful, which is why you need to be explicit and say, so therefore, what? Under motion, what trial counsel said, under motion, and your sympathy should also apply to trial counsel because counsel does not have the tools. I'm a sympathetic guy. I've got lots of sympathy for everyone. Yes, and under motion, what trial counsel said is that there was an unlawful extension, and that is the crux of my argument, is that there was an unlawful extension, and the unlawful extension, my refinement on trial counsel's argument, is that the unlawful extension occurred the moment the trial, that the K-9 unit was requested, and that is why we have a Rodriguez violation in this case. If there's no further questions. Do you have a chance to address this again remotely? Thank you. Okay, Ms. Burgess? Pronounce correctly, Burgess? Yes, Your Honor. Okay. May it please the Court? Good afternoon. My name is Amelia Burgess, and I'm appearing today on behalf of... Burgess. Burgess. Okay, I heard you. Okay. I'm appearing today on behalf of the people of the state of Illinois. The singular question before the Court today is whether the defendant in this matter was subjected to an illegal search and seizure in violation of the Fourth Amendment of both the Illinois and the United States Constitutions. Within that analysis, there are two questions for the Court to consider, and that is whether or not this was a consensual encounter, and if so, outside of the purview of the Fourth Amendment, whether or not the officer nonetheless had reasonable suspicion that would have allowed him to continue to extend the stop in a manner that still implicated the Fourth Amendment but was not in violation of it. Counsel for the defendant focused on the first of those two questions, and I will do the same here, because there were some very interesting questions raised about the particular interaction between the officer and the defendant in this matter, and whether or not the defendant affirmatively knew that the officer had requested a K-9 unit, and if so, whether that matters in the analysis. As was noted in the State's brief, there is strong incoming reason to believe that the defendant did not know that a K-9 unit had been requested. That's for a couple of reasons, as Justice Knapp pointed out. When that request was made, the defendant was speaking over the officer. He did not appear to be paying any attention to what the officer was doing. The officer did not directly arrest the defendant. He certainly did not say to them, I'm ordering a K-9 unit now. That did not happen here. He simply spoke into his microphone and did not explicitly say either of the words, I'm ordering a K-9 unit. He said, 31, and then something that was inaudible, K-9, please. So even so far in this analysis, there are many assumptions that have to be made in order to follow the defendant's argument here that the defendant permanently knew that a K-9 unit had been requested. Number one, that the defendant heard the request, but number two, is that the defendant understood the request. What does 31, K-9, please, actually mean? As I stand here today, I cannot tell you. Clearly, one permissible inference is that the officer was requesting a K-9 unit to come to his location. It could just as easily have been the officer asking, is a K-9 unit available? Necessary for any determination, though, that that request mattered. If we conclude that the evidence is sufficient to show that the defendant heard this, do you lose? No, Your Honor. How come? Because that still requires the defendant to in some way to believe that that mere request changed the nature of the consensual encounter. That the defendant at that point in time suddenly felt a compulsion to behave in a manner that he did not already feel he could behave in. The defendant testified at the motion to suppress? The defendant did testify at the motion to suppress. Did he say at what point, if any, he felt that he was no longer in a voluntary consensual posture? The defendant's position at the motion to suppress is that he always believed. He was unable to leave the vehicle. That he was unable to terminate the encounter. However, that is inconsistent with his actions. Because when the defendant was asked two times whether or not he would consent to a search of his vehicle, he declined. So at that point in time, it was clear the defendant realized that he was not under a compulsion to decline. Pausing right there. Isn't it troubling for the officer to ask for permission to search and the defendant declined twice and then to battle? No, Your Honor. And in some instances, it may be. But here is where the trial court's analysis of the behavior of the officer is very important, I think, to this court's determination. And that is that the officer, to me, throughout this interaction, was polite. He was courteous. It was clear that he was asking for permission. Even after he ordered the canine unit. He didn't say, a canine unit is coming. You must wait. He said, do you mind waiting? As the trial court noted, that was a very soft, very inoffensive and non-coercive way for the officer to interact with the defendant. As a result, a reasonable person in the defendant's position would have continued to understand like he did just a few minutes prior when he declined a search of his vehicle. But here's the problem. If I'm the defendant and I've twice declined an officer who has me in custody while dealing with these traffic matters, and he continues to ask this question, that suggests to me, and I think it suggests to a reasonable person, that my responses are not what he's about to accept until he gets an answer he likes. And, Your Honor, there's one way to look at it. However, I think in this instance, I think the defendant clearly was becoming more and more frustrated that he was not going to be able to get out of this situation easily. But when we look again at the whole picture, what happened when the defendant declined to allow the officer to search his vehicle? The officer said, okay, I understand. Didn't he say there are ways I can hold you up? I believe he said there are other ways we can do that. What's that supposed to mean or convey? I think it's a very vague statement, Your Honor. To be quite honest, it's a very vague statement. But there are many things that could mean. It could just mean that while we're waiting here, which you have agreed to do, the defendant agreed to do, while we're waiting here, I can just call the K-9 unit. And if the defendant had said, I don't want to wait for it, and the officer said, well, I would say I couldn't make him wait for it, and clearly, legally, he could not make him wait for it at that point in time, at least under this initial analysis, and we can talk about whether there was reason for that. Oh, he could have made him wait. He may not have won if there was a motion to suppress file, but he could have made him wait, right? Correct, Your Honor. Okay, when you first started speaking, you said that there also was a question whether it matters whether the defendant heard the request. I'm still unclear as to why it does matter. I think you're going to argue if the defendant didn't hear the request, it doesn't make sense. So address that, please. I don't know if I asked it quite right, but hopefully you understood it. Correct, Your Honor, because even if the defendant heard that request and understood it to be a request for a K-9 unit, it is still required for that request and nothing else to change the nature of the consensual encounter. To in some way have made the defendant feel compelled to do something he would not have otherwise done. But yes, if he did not hear it, though, how does that change your analysis? If he did not hear the request, then it's much simpler, because if nothing happened, it would change the nature of the encounter. Because at that point in time, we have an individual who would agree to a consensual encounter, who would ask to do things he didn't want to do. But if it did happen, the officer made the call, so you said nothing would happen to change the encounter, but the call was made. That is something, isn't it? Correct, Your Honor. That would change it? Correct, Your Honor. And the fact that the call was made, for the most part in this case, really hinges on whether the defendant heard it pursuant to the defendant's argument. But the state's position is the call in itself did not change the nature of the consensual encounter. So the state's argument is twofold. Number one, it's not apparent that the defendant heard or understood the request. And number two, even if he had or didn't hear it, it doesn't change the nature of the consensual encounter. And I have a reasonable degree of certainty in saying that because of the defendant's emotional distress. Because while he was not specifically asked about whether or not he heard the request for the K-9 unit, he was asked whether or not at any point in time did you say no, I don't want to wait for K-9. And then he didn't give a simple answer of yes or no. He actually explained his thought process at that point in time. And his response was no, because I was being respectful to him because he was being respectful to me. It was neutral. So right there, the defendant explained why he waited. He didn't wait because he felt a compulsion. He didn't wait because the K-9 unit had already been requested and he thought he didn't have an option but to wait. He waited because he was being respectful, because he was being polite. That does not in any way, shape, or form implicate the restrictions placed on law enforcement actions under the Fourth Amendment. Okay, so the state's argument is once the officer said I'm done with the traffic stuff, the defendant could have just said, okay, see ya, got out, took off, nothing. It would have been perfectly acceptable, fine. The officer would have done nothing more to prolong the stop. Correct, Your Honor. And if the officer had done something to prolong the stop, we would be having a very different conversation right now. And there may very well have been a different outcome of the trial court, but that is not what happened. Because the officer said, we're done with the traffic stuff. May I ask you some additional questions? And the defendant said, sure. Maybe some of that legal fiction stuff that Justice Connick was referring to earlier that's confusing me a bit. Anyway, I'm sorry to interrupt your argument. You heard my question to Mr. Saint-Germain about whether this argument was raised at the trial level. What's your position on that? This particular posture of the argument, I mean, obviously, the Fourth Amendment question was raised at the trial level. But this particular angle, or this particular argument that the call to request a canine unit is dispositive of this matter, would not be at the trial level. So the trial judge wouldn't have heard the argument? No, Your Honor. Not in this very specific way in which we were discussing it today. And before I leave this particular issue of whether or not it was a consensual encounter, whether that changed at all, I think it is worthwhile noting that while it is difficult to interpret the defendant's behavior on the video tape itself, it is worth noting that watching the video, there is some degree of ambiguity. I cannot tell you with 100 percent certainty that the defendant did not hear the request for a canine. I cannot tell you whether or not he understood, if he heard it, what that request meant. But that ambiguity, that factual ambiguity is left to the trial court to some extent to determine after hearing all the testimony and gauging the credibility of the witness. So the fact that there are other possible ways to interpret that information does not And I would like to briefly talk about the State's second problem, which is this notion of even if, for some reason, a consensual encounter was transformed to a non-consensual encounter, it was still appropriate under the Fourth Amendment because the deputy had a reasonable suspicion of criminal activity that he was justified in continuing to explore. And that was as a result of that consensual encounter because, as is noted by both parties, there was a period of time where there was no dispute between the defendant and the State, but there was a consensual encounter. And during that point in time, the officer asked additional questions of the defendant. And during that point in time, the officer gained additional information and had the ability to further observe the defendant in a manner that made him think to himself, quite reasonably, as has been defined under the law, that there was a reason to investigate Now, obviously, the officer was experienced and understood that if he could give consent, he would give fewer questions down the line about whether or not he had a reasonable suspicion. But that's just good, practical law enforcement in action. That is not an indication that he lacked a reasonable suspicion to perform a search of the vehicle. And as is noted in the State's brief, many of the defendant's responses to questions in that consensual period understood and raised concerns by the officer. In particular, the defendant's changing responses to his questions, especially when it came to his own personal drug use. He originally denied ever using marijuana. And then after further questioning, he said, well, maybe I did back in high school. And then after some more time, he said, well, maybe about a month and a half ago. And similarly, when the officer said, if I had a canine walk around your vehicle, would the canine alert? The defendant originally said, no, no, of course not. But then after further questioning, he again softened and said, well, maybe. But don't worry, there's an innocent explanation. And under the law, under the reasonable suspicion case law, there's no requirement that the officer defer to that innocent explanation. When you have a defender, when you have a person that you're speaking with who gives you reason to believe that a canine unit will alert on a vehicle, that is something that the officer is entitled to explore further under Illinois law and certainly under the Fourth Amendment analysis. So even if the request for a canine unit in some way transformed a consensual encounter into one that was no longer consensual and that one that implemented the Fourth Amendment, nonetheless, the Fourth Amendment prohibitions and protections against illegal search and seizure were not violated in this manner because the officer had reasonable suspicion to request a canine unit and or to perform a search of the vehicle. However, of course, he didn't do either of those things until after he found additional evidence, and that was the marijuana residue on the defendant's zipper. And it was only at that point in time that he actually searched the vehicle. And to some extent, factually, this is an interesting case because we spent a lot of time talking about the implications of a canine search and a case where a canine search was never, or a sniff test was never actually performed. But based on all these factors, the state would respectfully request that the trial court affirm, I'm sorry, that the appellate court affirm the trial court's ruling with regards to the motion to suppress and the author of the conviction of the defendant. Thank you, Your Honor. Okay. Thank you, counsel. Mr. San Germain, any rebuttals yet? Yes. Okay. Thank you, Your Honor. Five points of rebuttal. I will start with the reasonable suspicion. First, there was no reasonable suspicion. All of the information that Bethany Campbell testified to at the hearing on the motion to suppress was observable before he requested the canine search. It was observable even before he returned and issued the warning in this case. In fact, the things that he described as raising his suspicion was observable even before he decided to stop the call. I'm not sure I understand why that matters. It matters because if he had gleaned additional information, as counsel stated, then he would have alluded to this additional information during his testimony on the motion. But what he points to are all matters that were observable before the consensual encounter. Well, Mrs. Burgess' position would be he simply then raises the basis that much sooner. Then in that case, why didn't he call the dog way before he had? Because he's too nice a guy, I guess. I don't know. Well, that's... Is there a requirement that if he doesn't act upon it immediately, it goes away? No, but there is a requirement that once the traffic stop has ended, this is a Rodriguez requirement, once the traffic stop has ended, then you must have additional reasonable suspicion to explain. Well, or you can have it all along and finish the traffic stop. In that case, he should have... No, Your Honor. Why not? That is not the standard because in this case, he clearly told it. He clearly told it that the stop has concluded. I have nothing further. Would you mind answering an additional question? If he had something, he should have called the dog. Well, that's an interesting point because I'm not sure in a sense. Let's assume that he had, assume for the sake of argument, that he had sufficient basis to hold him to get the dog from the get-go. Does his saying, just to put the guy at ease that he's now done with all this and wants to just talk to him on other things without saying that's what he plans to do, does that diminish his authority to do it? Yes. Correct. Yes, under Rodriguez, it does. However... Well, Rodriguez assumes that he didn't have any authority beyond the traffic stop. Then that's my second point on rebuttal. Okay, go ahead. It's that he didn't have that. He didn't have the authority. He didn't have reasonable suspicion. Because what he's pointing to, none of these factors creates reasonable suspicion. The evasiveness that counsel is arguing does not exist. The providing one answer and then providing an innocent answer, that never occurred. My client said he didn't smoke weed. My client said he didn't smoke weed recently, but he did in high school. That is a complete answer. Then my client said that if a dog search was to be conducted, if a dog search was to be conducted, there would be no positive result. And at that time, Deputy Campbell, provided him with a hypothetical, well, the dog could alert on a trace example. And my client said, yeah, if that's the case, then yeah, I'm around certain people. But I will tell you, no, the dog wouldn't alert. As to hearing the call, it does not matter whether he heard it. Because what matters is that we are moving from a consensual encounter into a non-consensual encounter. The problem with that argument is if the focus is consensual or non-consensual, is on the understanding and the attitude of the suspect, then the focus ought to be on what he heard, what he knows, what he thought, what he believed. And if he didn't hear something, it couldn't have affected any of those. That's incorrect, Justice Feiglin. The focus is on the message conveyed. That is, in Boston v. Florida, with pits of the language in Bordali v. California, once the officer involved in this case has conveyed a message, it does not matter on the recipient's side. It's the concern of the message. How could that be possible? You mean if the recipient never hears it, it doesn't matter? Yes. That reminds me of the old story that has been rejected about custodial interrogations. It used to be, and some lawyers and judges talked about this for a long time, that it was the intent in part of the officer conducting the interrogation as to whether he intended to arrest them that would affect whether it's a custodial interrogation. In fact, now, I wrote about this a lot, the focus is entirely on one of the defendants, one of the suspects, not what the officers thought or said. Respectfully, Justice Feiglin, we're not at the same, these are two different doctrines. Custodial interrogation is a Fifth Amendment issue. This is a Fourth Amendment issue. And this is even more a niche area of the Fourth Amendment issue. Consensual encounters by nature must be consensual on both ends. The officer must understand that what he is doing is within the limited purposes of the consent, and it goes beyond that limited purpose. So if the record were clear beyond dispute that the officer thought this or said it but never communicated it to the defendant, in your judgment, that makes no difference? If the officer didn't communicate it, if there was no convenience of a message, which is the language used in Udari v. California. As you said, a consensual encounter assumes the parties believe it's consensual. Conveying a message, doesn't the conveyance imply the message is received? No, because I can convey a letter to you, Justice Kinnick, by placing it in the mail. If you did not receive it, that does not eliminate the fact that I have conveyed that letter to you. But does it affect what he thinks about a situation based upon what might be in the letter that you never got? Yes, but if I am terminating my consent with Justice Kinnick, the moment I convey the mailbox rule here, not to bring in other contractual arguments into this Fourth Amendment issue, but it is conveyed, I would ask this vote to be reversed immediately. Well, I want to thank you both, counsel. This has been an interesting case, and you both have done a very nice job. Thank you. Thank you. Thank you, Madam Attorney, for inviting me to be here this evening.